The last case this morning, docket, I believe, is in the Marriage of Thiessen. And we've got Mr. Graham and Mr. Kretner. Is that right, Mr. Graham? Thank you, Your Honor. May it please the Court, Mr. Kretner. This is a case that is also a dissolution of marriage action. Part of the nature of the case was that the parties were operating a family farm prior to the time of the commencement of the dissolution action. And that family farm raised two issues during the course of the trial that I think I'd like to address. We have addressed other issues in the brief, and we don't mean by any means to waive those. But the most pertinent of the issues and the one that yields the greatest difference in the result is the one that relates to the operation of the family farm. The two issues that were raised at the commencement of the trial were, one, that the farming operation itself being whatever physical plant that encompassed and entailed was a gift to Jan Thiessen and to his brother. That would be the husband and the husband's brother. And the second issue was that that operation itself was, in fact, a partnership between the two of them. The end result of that in the trial court was that the trial court determined, I think on a compromise basis, that there was no gift. In fact, I think when you look at the record in this case, you'll see that there wasn't anything to gift. It was rented farm ground, rented equipment, those kinds of things. So there wasn't any gift made. The trial court determined that there was not a gift. But to counterbalance that, I think, what the trial court did was determine that a partnership existed between the husband and his brother, which essentially took 50% of that portion of what would otherwise have been a part of the marital estate and made it non-marital property or partnership property or something that accrued somewhere other than in the marital estate. The history of that operation was generally that prior to 1995 or 1996, in that general area, Mr. Thiessen's father, probably with the assistance of everybody in the Thiessen family, operated this 220 plus or minus acre farm, farmed with his own equipment, did his own labor, sold his own grain, purchased all his own supplies, those kinds of things. But everybody in the farm participated in that. And in 1995 and 1996, when he decided that he wanted to retire and leave that farming operation, he wanted to have his sons, his two sons, I think, take that over. The record bears out the fact that at least at the commencement of that process, the two sons went to see an accountant and talked to the accountant about how they were going to manage this partnership between the two of them and, in particular, how they were going to file their tax return. The accountant told them at the time, just one of you file a tax return, take all the income and expenses on that one return, and then apportion the rest of it between the two of you, however you think it's appropriate, and you just go on down the road. Government doesn't care, as long as the income is being taxed and the tax is being paid. So at least for the first year, they actually did that. Jan Thiessen reported all the income, all the expenses on his personal income tax return, and there was an apportionment of the profits of the farm between Jan and his brother Joel. Each one of them received something a little bit in excess of $5,200, which also included a 50% share of the ASCS farm program payments that would have approved to them at that time. Now, very shortly after they started operating the farm on that basis, though, Joel Thiessen, the husband's brother, went through a divorce, and the record is there are a number of reasons why he may have gone through the divorce. Some of them may have included alcohol problems and other things. My client, Ms. Thiessen, indicated that there was a period of time where Joel Thiessen was not welcome on the farm at all. He was not capable of operating machinery and doing the work that needed to be done, so he was prohibited from participating. But what interestingly happened at that point in time was that whether it was to Joel Thiessen's benefit or Jan's or the farm's, I don't know. Frankly, I don't think it makes any difference. They changed the farm operation from what it had been during the prior year and what it had been during the previous years when the senior Mr. Thiessen had operated it. When they changed the farming operation around, because Joel was getting a divorce, they opened a new checking account. The old checking account was Thiessen Brothers Farms. It was owned by Joel and Jan Thiessen. Now, all of a sudden, that farm checking account was abandoned. A new account was opened just in Jan Thiessen's name, her husband in this case. And it was operated, depending on who you listen to from one time to another, with the signature authority of almost everybody in the family, but owned expressly by Jan Thiessen, EBA, Thiessen Farms, as opposed to Thiessen Brothers Farms. At the same time, they went to the ASCS office and they signed Joel off all future government payments so that he would no longer be entitled to receive any of those. In the first year of the farm operation, Joel and Jan took out an operating loan at the bank. I don't recall right off the top of my head whether both of them signed the note. My recollection is that they did. But the financial statement that was provided to the bank during that first year was authored by both Joel and Jan Thiessen. But in the second year, after Joel's divorce and dependency of that matter, now the financial statements are only authored by Jan Thiessen. And they explicitly state that Jan Thiessen owns all the income, all the expenses, all the debts, and all the assets that are identified on those financial statements. And it continues that way all the way up until the time that these parties start to undergo a division. Was this like an open account for the bank for their operation expenses or something? Is that why you had to periodically redo the financial statements? Right. Well, they took out an operating loan every year. And the operating loan during the first year, my recollection is that both Jan and Joel signed the operating loan. But in all further years, after 1997, only Jan Thiessen signed the operating loan. And when did the brother get divorced? It was in 1996 and 1997. And that's just part of that situation. They discontinued the ability to participate in government program payments. They changed the bank account. Now only the one brother, Jan, participated in taking out the operating loans. Jan, from that point forward, to the extent that equipment was purchased, purchased it in his name. To the extent that grain was sold, it was always sold from that point forward only in his name. To the extent that the farm was operated in any fashion from that point forward, up until the time when these parties started a divorce proceeding. Everything was operated just in Jan's name. And as Lisa testified, and I think as everybody testified, Lisa participated in the farming operation to a different extent as all the other members of the family did. The entire family, and that would include the senior Thiessen, Joel, and these parties' children. But all of them participated in the operation of the farm up until that point in time. Now, I made a list here of all the things they did. I know there was a checking account ASCS. At that point in time, as we've identified in the brief, after the first year, there was no more proportionate sharing of income or expense between Jan and Joel. Joel's receipt of any kind of benefit from the farm operation after that point in time came in generally by check, I think on one or two occasions by money order. All of them had some kind of a reference memo on them. Almost all of them referenced either labor or parts, shed rental, those kinds of things. I think there were three checks that were represented as being, quote, Joe's draw, end quote. And those distributions were not in any way, shape, or form, did they mirror in any respect what Jan Thiessen was taking out of the farm. Jan Thiessen continued to file individual income tax returns rather than partnership income tax returns. And in those income tax returns, he accepted all of the benefit of all of the income and all of the expenses of the operation of the farm without making any contribution back to Joel for any of those. And in some years, the tax benefit of those things was substantial, where they were carrying over enough of a loss that the loss eliminated all of the party's tax liability. But none of that was shared with Joel. The loans were taken exclusively in Jan's name. All the equipment was purchased in Jan's name. The public filings that were made in this particular case with ASCS, because there was never a partnership filing, so to speak, made with any kind of a state agency, either the Secretary of State's office or an assumed name filing with the county clerk. All of those public filings, in this case ASCS filings, indicated the ownership of all of the grain, all of the assets, all of the rights of the farm, solely in Jan's name. The court's responsibility in that situation is to determine, based on the intent of the parties, whether or not a partnership actually existed. And in order to do that, the court is to look at a number of factors, which have been pretty routinely determined by, I think, all the districts in this state. This court has indicated them in Maloney versus, I think it's Piera. And those factors appear to be the manner in which the parties have dealt with each other, the mode in which each has, with the knowledge of the other, dealt with persons in a partnership capacity, whether they have filed a partnership certificate, as I mentioned just a minute ago, whether they've carried advertising in the firm name, and whether they've shared the profits of the partnership. Generally, it is the burden of the person asserting the right of the partnership to prove that by preponderance of the evidence. But there are cases in Illinois that indicate that where there is written documentation that would evidence some relationship between the parties, other than a partnership, that the court should view that and determine that a partnership exists only in the event that it's proven by clear and convincing evidence. Our position relative to the partnership issue, which is the one that creates probably about a $30,000 or $40,000 difference in the division of property to my client, to Ms. Deason, is that the information and the evidence that was presented not only doesn't raise to the level of clear and convincing evidence, certainly, but certainly does not reach a preponderance standard. The only evidence, I think, that was presented in this case that would support the existence of a partnership between these parties is the statement, just the single statement, by Jan Deason, by Joel Deason, and by the senior Deason, that they at one time or another intended that a partnership exist. And all of their actions after that time rely on those statements. All of their actions after that time indicate that Jan and Lisa Deason were the people who operated this farming concern during almost the entirety of its existence during Jan and Lisa's marriage. And our position in this has to be then that where that evidence so overwhelms the statements of the parties, because this was a verbal arrangement that they made, that the trial court should have taken a look at those actions, scrutinized those more carefully, and come to the determination that, in fact, a partnership did not exist in this case. Now, I've mentioned before there are a couple other issues in the brief that we've raised dealing with the valuation of property and the last one being the allocation of property between the parties. In this case, I think it's abundantly clear that what the trial judge wanted to do was to apportion 50% of the estate to one party and 50% of the estate to the other party. When you look at the court's order, and Mr. Prettner has indicated it in his brief, what the court actually did was to award 53% or 54%, which may not sound like a lot, but under these circumstances it is, but award 53% or 54% of the estate to Mr. Deason and about 46% or 47% of the estate to Ms. Deason. Every $1,000 here makes a difference. And in a case where Mr. Deason's income, at least in the year that we tried this divorce case, was about twice what Ms. Deason's income was, where he's living in the family home that was gifted to the parties during the course of their marriage and she's living in a trailer, where he's operating, living on two jobs, working for an auto parts company and also doing farming, and she's working in a coal mine, it makes a difference. And in this case, we believe that all of those things should have been considered more appropriately by the trial court and that there should have been a different disposition of the assets. Thank you, counsel. Mr. Pretner? May it please the court and counsel? I'm a little bit surprised this morning to hear that it's now Lisa's position that Joel was the partner at the beginning of this adventure or venture between he and his brother given to them by their father. Because throughout the trial and in counsel's brief, it was Lisa's position and she testified that it was her understanding that only Jan and Herbert wanted to participate in the farming operation when his parents transferred to farming business. The only problem is that throughout counsel's brief, he ignores the facts that were presented at trial. Thomas Smith, the accountant, testified about how Ronald G. Mason, the father, came to him and said, look, I'm thinking about getting out of the business. What should I do and where to effectuate the transfer of this property to my two boys? Thomas Smith testified the two boys came to talk with him about how to set up the best business model. Should we incorporate was one of their questions. Should we have a form of partnership? They were advised by the accountant, sadly, that rather than do any of those things, since this was a small 200-acre farming operation, one of them could claim the income and the expenses on their tax return. They could share their profits. If the reigning taxes owed, the farm could reimburse the person who claimed the income from the farm account. That indeed did happen. There was a letter in February of 1997 from Thomas Smith to Joel and Jan stating, this is how much extra Jan had to pay because of the income from the farm. So the farm then reimbursed Jan. But from the very outset, the next person to testify, Ronald G. Mason, the father, said clearly, it was his intent to transfer the farm business to both of his sons. It was our argument at trial that that transfer was a gift. It was a business. It included the use of the machinery, the ability to farm and ground. But it was a gift. Ironically, had Ronald G. formed a small corporation and put the farm machinery in a corporation and then transferred the shares to the two boys, we wouldn't be here. It would have clearly been a gift. But now that didn't happen. I think there was some poor advice there. Ronald G. also testified that when he and his wife gave Jan and his wife the house that they lived in, that they had the house appraised, and gave Joel, the other son, they only had two children, Jan and Joel, they gave Joel a like amount of money in cash. It was his intent to be transferred equally. The two sons of the farmers who were involved in the farming operation, The two sons both testified that they believed that Uncle Joel and their father were partners in the farming operation. J.R., the older son, said, as far as I know, Uncle Joel and my dad have always been partners. That was his statement. Were they 50-50 partners? 50-50 partners. And then, of course, Joel testified and Jan testified.  It was in 1999 that I believe the divorce was filed. There was an exhibit, I believe it was Petitioner's Exhibit 26, that involved a variety of farm documents, receipts, canceled checks, showing that Joel was receiving the bills, was writing some of the checks, a large variety, a group exhibit, showing what took place during that time. Joel did testify to experiencing alcohol problems. He did get divorced. When was the divorce filed? I think it filed in 1999 and it was finalized in 2000, the way I recollect it. It should be on the record. It should be in the record. And I'm fairly certain I'm right about that. Now, what happened with the financial statements? Each year, the bank that the boys used, which happened to be the same bank that their mother worked at and their father used, required a financial statement. And that's so they could go borrow money to buy seed, fertilizer, and farm the ground. And I believe that's Petitioner's 25. I included every financial statement that was filed from 1995, I believe in November, through the date of the trial, which I think was 08. In 95, both boys signed it. After that, and the testimony was that Jan was to take care of this, the paperwork with the bank, Jan signed the financial statements. In 2003, the bank changed their form. They asked on the financial statement, do you own 100% interest in this operation? In 04, 05, 06, 07, 08, Jan said no, 50-50, partnered with his brother. That's part of the record. Now, most partnership cases involve a dispute between partners, or at least many of them do. This is not a dispute between partners. The partners both testified that they had a partnership. The two checking accounts, the checking account, there was an original farm checking account that was created in 95 or 96. Both had Joel and Jan's name on the account. It's called Beeson Brothers Farm. You had their social securities. Also had mom, his mother, his father, and Lisa on there to sign checks. The original account, I think, also had Joel's wife so she could sign checks, but the owners were Jan and Joel. The second account that was created sometime in 99 had Jan and Joel on the checking account, had their social security numbers. They were the owners of the account. Also had Lisa, mom, and dad as people who could sign checks, but they were not the owners. So, in effect, there was no change. That account is still being used today. Now, what kind of marital business would there be where your brother-in-law and your father-in-law and your mother-in-law is on a checking account with you and your husband? And your name is only on the signatory, not as an owner. So if you die, your brother-in-law gets the proceeds from the checking account. And if you read the partnership cases that deal with this issue, the checking account is a major determination as to whether a partnership exists because it's a major issue on whether profits and losses are being shared between the parties. If you look at the Snyder case, the counsel mentions a clear and convincing case, I'll call it. This was a dispute between two doctors who apparently had a cost-sharing arrangement, at least that's what one thought he had, where he contributed a percentage of his income to pay for overhead, insurance, things of that nature. Very much different case than this. He had no interest in the checking account at all, shared in none of the profits, and court found there was no partnership there. Here we have a vastly different situation, and the testimony from the witnesses that were presented was vastly different. You have to remember also, Lisa testified this was a family farm business that the father and mother gave to her and James. She presented no witnesses that could corroborate anything she said. She presented no physical evidence other than there were items that were signed by James, but not signed by Joel. But in a small operation such as this, especially where you have an accountant who told them this was okay, this is how you got it, you can do it, it's not unusual. Lisa had no explanation for the documents included in Petitioner's Exhibit 26, which went totally against her position. There were several issues. She had no explanation why she wasn't an owner of the checking account. She had no explanation why she wasn't present when Joel and Jan, and at the time Joel's wife, met with the accountant to determine what type of business entity to set up. She wasn't there. Her entire testimony was completely uncorroborated. She had no evidence whatsoever to refute any of the testimony of Joel, Jan, Mr. Thiessen, the accountant, or two sons. Judge Long asked towards, I think it was in the third day of trial, that we provide him with additional information concerning documents that we may have showing what monies Joel had earned. We did that. It took about a whole extra day. He wanted this additional information. We came up with that additional information. The boys had been in business since 96, so they had to go searching for it in the barn. That was another issue. They kept all their farm records and their checking account in the barn, in an office that was created in the barn on the farm by where their dad lives. Not at Jan's house. This was in a different location, which would refute the fact that this was some type of family farm. I do want to make one point. Counsel refers in his original brief, and then again in his reply brief, to a situation regarding an ex parte communication. I want to address that because I want to explain to the court how that ex parte communication came about. The court entered its findings. I filed a post-trial motion. On March 26, 2009, the court entered an order on my post-trial motion. Oh, excuse me. That was July 15th. Original order was entered March 26th. Order on post-trial motion was entered July 15th. I noted in the court's order that the court had made an error in paragraph 3 in its calculations. It found that my client, after receiving half of the farm assets, received an award of $112,000. Well, the problem was $74,000 plus $76,000 is approximately $150,686. So the court made an error in its calculation to my client's benefit, Mr. Grant's client's debt benefit. When I saw that, I filed a motion to clarify. The court, without any type of hearing, on July 24th, issued an order clarifying its previous order, basically setting out how it calculated the farm assets and what 50% of that was. I called the clerk. I said, look, I need a hearing on this. I need a hearing. I want you to set me up a hearing with the judge. The same day, the clerk calls me back and says, you have a conference call. You, Mr. Grant, have a conference call with Judge Long at 845 in the morning. I said, well, I have court at 9 o'clock in the morning. I'll meet in Judge Long's office. I went to Judge Long's office at 845 the next morning. We called Mr. Graham at his office. He wasn't there. I had Mr. Graham's cell phone. We called Mr. Graham on his cell phone. We got his answering machine. At that time, Judge Long asked me, what's the basis? Why do you want a hearing? I said, you made a mistake in calculation. You need to fix it. He says, do an order fixing the calculation. I did the order of July 30, 2009. So I wanted to point that out to the court that that's how ex parte communication came about. And I must say, Judge Long is one who I would consider to be very strict when it comes to issues concerning things like ex parte communication. On those same lines, was it the intent of the trial judge to divide the property equally? I think that after the court entered its post-trial motion, or order on post-trial motion, remember in its original order, the court did not calculate the value of the bins, didn't consider the debt they're on. I think the court thought about what happened here, realized that, hey, you know, Jan's parents gave, leasing him this house that now is counted on Jan's side of the pie for $76,000. And Jan's parents did give Joel and Jan the right to farm this ground, of which about $74,000 of grain and equipment was counted on Jan's side of the pie. So I think the court felt that the disposition, as was included in its final order, was fair. So the answer to my question is no? I think originally he intended it to be 50%, but I think in the end he felt that the final disposition was fair. So the answer would be no. In the end, I think he changed his mind. And I think 53%, based on the amount of assets in this case, 53, 47 is very close to 50-50. And the equities, I think, follow my client's side. I want to point this out. Counsel indicates that my client was making twice what his client was. I'm baffled by that statement. The evidence is, and the record's clear, that Lisa made about $60,000 working as a coal miner, a little over that in the year we went to trial. My client made about $30,000 working for McKay Auto Parts. The farm income that year they lost $24,000, he and his brother, and they did file a partnership tax return. And that was at my advice. And I think if I hadn't advised them to do that, I'd be committing malpractice. But I don't understand where counsel can stand here and say that Lisa, that my client made twice what Lisa did. That's another thing the court has to consider in the division of property. Lisa was making about double from her income at her employment as to what my client made. Any other questions? I want to thank the court for taking this time out to consider this. Thank you, counsel. Any rebuttals? Before you get into the issues, you brought up the fact that it was a 50-50 equal intention of the court. When the judgment came out, did you ask the court to clarify it or anything? Did you take any steps to point out either the mathematical error that the court did or overlook the fact or anything? I did not, Judge. The reason I did not was because there are a number of different ways that that allocation of property between the parties could have been computed in dollars and cents. There were disputes over the price of grain and the valuation of various items of property. The trial court was not particularly clear in especially the initial orders that it entered in making us aware of what it was he was actually apportioning dollars and cents worth. When I sat down and I ran those numbers, put them in my spreadsheet, ran those numbers with that allocation of property, I came up with something that wasn't 50-50 but didn't look right to me anyway for different reasons including partnership reasons and the valuation reasons that we've addressed. My intention at the time was just to file a notice of appeal and bring it up on appeal. And Mr. Thiessen decided to file post-trial motions and that resulted in a whole slew of orders entered by the trial court to correct a deficiency that essentially, just my observation, that essentially made in ruling on the first post-trial motion. I think the judge made a – I think he made an error in adding things up. He entered the first judgment which said 75 plus or minus $1,000 was to be paid by Mr. Thiessen and Ms. Thiessen. Then there was a post-trial motion, yeah, post-trial motion file. He reconsidered a number of issues that Mr. Thiessen had asked him to reconsider and then added up the numbers I think that he already had in his notes and came up with a completely different number which was way off of what had come up the first time. Whereas initially he had suggested a cash payment of plus or minus $75,000, now he was ordering a cash payment of 40-something. It was dramatically different. And then in correcting those things, Mr. Predner filed another motion to clarify a couple other motions that eventually resulted in this ex parte communication that took place. And I'm not suggesting by mentioning in the brief that it was ex parte that Judge Long did anything wrong or that Mr. Predner did anything wrong. The reason I mention it that way is because I wasn't a part of it. I wasn't aware of what was going on at the time that it happened and couldn't have done anything to have corrected it at the time. So after the judge made that determination and we sat down and took a look at the numbers, I was aware that the division wasn't going to be 50-50, but at the same time we had larger issues with respect to the valuation of property and the issues as to whether or not a partnership existed. And so that's the reason why we didn't bring that back to the trial court's attention. As far as the issue on whether the judge intended a 50-50 division or not, Mr. Thiessen was earning from his regular employment 30-some thousand dollars a year at the time that this matter went to trial. Ms. Thiessen was earning something plus or minus $60,000 a year from her regular employment. But what happened at the time of trial was that Mr. Thiessen did not include in any of his filings any of the income or expenses or the assets, although he did include some of the debts, of the farming operation. And if you took for that year the amount of income that he actually earned less tax, his income was over $120,000 during that year. Ms. Thiessen's income during that year was limited to what she was earning at home, which was plus or minus $60,000. So his income actually was about twice what hers was at the time. And although we were not asking for an award of maintenance at the time, primarily because we're aware that farm incomes fluctuate dramatically from year to year, and that there were years where they did take a loss, we were not interested in having anything other than a 50-50 distribution, and I can't imagine that a judge under those circumstances would have awarded anything other than a 50-50 distribution of property between the parties. And then in his order, Judge Long specifically indicated that the allocation of cash payment that he was making from Mr. Thiessen to Ms. Thiessen was to equalize the division of property between the two of them. What he wanted to do was to equalize that division. And I don't think that's anywhere more apparent than in Mr. Thiessen's brief where he indicates that this is the allocation of property that the judge ordered. And it doesn't order a 50-50 allocation. And that's at the numbers that the court used, which were suggested to him by Mr. Thiessen, which we've already mentioned in our brief. We don't believe are supported by the evidence. Ms. Thiessen's position at trial, at the beginning of trial and throughout the trial, was that there was never a partnership between the two brothers. That was her position. At the very end of the trial, Mr. Thiessen came forward with some evidence that we were able to review, not while the case was proceeding and the judge indicated that it would be admitted into evidence in his last docket entry, but not during the trial, but after the trial was over and while we were preparing written arguments. And among that documentation, in particular this was from the ASCS office, we were able to find documentation in 1997 where Jan Thiessen and Lisa Thiessen had discontinued and terminated Joel Thiessen's right to receive any part of the ASCS payment. Now, my record and what I note in my brief with the citation to the record page is that Joel Thiessen testified that in 1996 and 1997 he was going through a divorce. In 1997, the checking account was changed. The checking account was changed so that Joel Thiessen didn't have signature authority on the account. And my client indicated all during that period of time, she thought when she signed the signature card, hers was the only other name on it as having signature authority. Now, when we proceeded to trial and they presented the signature card at trial, everybody in the family had signed it. And when we inquired of those members as they testified, when they signed it, they told us the card had always been signed that way. I don't know whether it was or whether it wasn't, but it certainly appears to me that during the course of this entire process of their operating this farm, that after 1996 and 1997, when the situation seems to have dramatically changed, and all the way up until the time that Jan and Lisa Thiessen commenced this dissolution marriage action, all of that farm operation was managed by Jan Thiessen for the benefit of this family. Thank you. Gentlemen, thank you very much for your arguments and your briefs. We'll take them at our advisory.